**DISTRICT OF OREGON**
**F I L E D**
**March 31, 2025**
**Clerk, U.S. Bankruptcy Court**

Below is an opinion of the court.

_David W. Hercher_
_____
DAVID W. HERCHER
U.S. Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re | |
| **Rebecca J. Almy**, | Case No. 22-30471-dwh7 |
| Debtor. | **MEMORANDUM DECISION ON MOTION FOR CONTEMPT AGAINST ZIP CO. US INC. AND WEBBANK**[1] |

## I.     Introduction

Rebecca Almy, the chapter 7 debtor, moves[2] for contempt against Zip

Co. US Inc. and WebBank, alleging violations of the automatic stay and the

discharge injunction.

---

[1] This disposition is specific to this action. It may be cited for whatever persuasive value it may have.
[2] ECF No. 26.

Page 1 – MEMORANDUM DECISION ON MOTION FOR CONTEMPT etc.

For the reasons that follow, I will grant the motion as to Zip and award Almy $10,000–$5,000 as compensatory damages and $5,000 as mild punitive sanctions. I will deny the motion as to WebBank.

## II.    Background

Almy filed her petition initiating this case on March 28, 2022. The discharge order was entered on June 24, 2022.[3] Zip and WebBank both appear in the Bankruptcy Noticing Center (BNC) certificates of notice for the notice of bankruptcy[4] (mailed on March 30, 2022) and the discharge order (mailed on June 29, 2022),[5] indicating that they received those documents. The address to which the notice and order were mailed to Zip includes as its second line "Bankruptcy Notices."

The motion, filed on June 26, 2024, alleges that Zip and WebBank have "continued to send collection demands directly to Debtor's email."[6] Almy requests awards of compensatory damages of $30,000 for economic loss and emotional harm, reasonable attorney fees and costs to prosecute the motion, and "mild deterrent sanctions not to exceed $5,000 . . .."[7] The motion included a notice that the response deadline was 14 days after service of the motion. The motion was mailed to Zip and WebBank in care of their CEOs.

[3] ECF No. 15.
[4] ECF No. 8.
[5] ECF No. 17.
[6] ECF No. 26 at 2; ECF No. 26 Decl. of Almy at 2 ¶ 5.
[7] ECF No. 26 at 4.

Neither Zip nor WebBank responded to the motion or participated in the evidentiary hearing.[8]

## III.   Facts

### A.   *Establishment of Zip account*

Almy had an account with Zip, which allowed her to make installment payments for online purchases. Before the petition date, she was current on her payments due to Zip.

### B.   *Zip's postpetition communications*

#### 1.   Predischarge communications

Almy's lawyer's office sent a letter to Zip on April 9, 2022, saying that Almy had received text messages from Zip and warning it to stop communicating with her to collect a prebankruptcy debt.[9]

On April 24, 2022, Almy received a text message saying that a "Zip payment" of $50 had not been received and that she owed "$50.00 incl $7.00 late fee" and "Pay now at zip.co/us/pay."[10]

On May 3, 2022, Zip sent Almy an email entitled "Zip Installment Reminder," saying that it would automatically charge her card $45.13 on May 7, 2022, for an installment payment for an order. The email said that if charging the card failed, Zip would attempt other payment methods, and she should make sure her card had enough funds to cover the installment so she

---

[8] ECF No. 35.
[9] ECF No. 34-4 Ex. C.
[10] ECF No. 34-4 Ex. D at 14, 16.

would avoid a late fee. Almy forwarded that email to her bankruptcy lawyer's office asking "[h]aven't you already contacted them twice?"[11]

On May 6, 2022, she received an email[12] similar to the one from May 3 and a text message[13] saying that "Your Zip payment of $45.13 is due tomorrow," asking that she have funds available on her Mastercard, and warning that a late fee may apply for nonpayment. The text included a link to "[p]ay now." She forwarded the April 24 and May 6 texts to her lawyer's office, asking that the office "[l]et me know how we move forward."[14]

On May 8, 2022, Zip sent Almy an email entitled "You've been charged $7.00," saying that her payment of $50 for her order still had not been received in full, and a $7 late fee had been applied. Zip asked that she add funds or update her payment card and "pay today." The amount then due was $52.13, including the late fee.[15]

On May 9, 2022, Zip sent Almy an email entitled "[Overdue Notice] Your payment is 30 days late." Zip said it had been unable to recover payments for the order from March 26, 2022, and "this means your account is already 30 days overdue." For her to use Zip again, she would need to log in and "pay off any overdue installments to bring your account back into good standing." Accounts left unpaid for more than 60 days would "be passed to a

---

[11] ECF No. 34-4 Ex. D at 1–2.
[12] ECF No. 34-4 Ex. D at 3–5.
[13] ECF No. 34-4 Ex. D at 14–15.
[14] ECF No. 34-4 Ex. D at 14.
[15] ECF No. 34-4 Ex. D at 6.

collection agency, you will then be liable for their collection costs and this process may adversely impact your credit score." The amount then due was $51.[16]

On May 23, 2022, Zip sent an email like the one from May 9, saying that the amount "DUE NOW" was $58. Almy forwarded that email to her lawyer's office, saying, "I thought [her lawyer] said we could sue if they didn't stop. I'd like to move forward with that."[17]

One of the pages of the admitted exhibits shows two violative text messages without specific dates. The first says it was sent on a Saturday at 3:53 a.m., and the second says it was sent at 4:52 a.m., which I take to be later that same day. The first says that a payment to Zip of $45.13 was unsuccessful and asks Almy to "[u]pdate payment details or pay now . . .." The second says that a payment of $50 had not been received and then due was $44.13, including a $7 late fee.[18] In Almy's testimony, she referred once to that page, confirming the texts were sent after the petition date, but she did not otherwise date those texts. By comparing the amounts sought in those undated texts to the amounts sought in the emails and other texts, I infer that the undated texts were sent before the June 24, 2022, discharge.

Although the admitted exhibits did not include copies of any emails between May 23 and July 6, 2022, Almy said she received emails during that

[16] ECF No. 34-4 Ex. D at 7–8.
[17] ECF No. 34-4 Ex. D at 9–10.
[18] ECF No. 34-4 Ex. D at 13.

Page 5 – MEMORANDUM DECISION ON MOTION FOR CONTEMPT etc.

period, one every one to four days. She stopped sending all of them to her lawyer's paralegal because she was "feeling really discouraged."

## 2.    Post-discharge communications

On July 6, 2022, Zip sent Almy an email entitled "[Overdue Notice] Your payment is 60 days late." Zip said it had been unable to recover payments for the order, her account was 60 days overdue, and the account would "be passed onto a debt collections agency." To use Zip again, she would need to "pay off any overdue installments." The amount then due was $52.13. She forwarded that email to her lawyer's office on October 22, 2022.[19]

On October 5, 2023, Zip sent Almy an email entitled "Important: Zip US Privacy Policy Updates." Zip had updated its privacy policy.[20] It did not address Almy's debt.

Almy testified that the emails included in her exhibits were only a sample, and she had 20 to 30 emails "over a period of six months or so." She specifically testified that she continued to receive emails for a long time after the ones that appear in the record. But she apparently did not distinguish between emails demanding payment of a debt and other kinds of emails that Zip sent her. She received many other texts, but no others appear in the record. Although the sparseness of the record makes it impossible to know when all the texts were sent, and although her lawyer urged me to find that

---

[19] ECF No. 34-4, Ex. D at 11–12.
[20] ECF No. 34-5, Ex. E.

they were sent over several years, I think it more likely—and I therefore find—that they were all sent between March 28 (the petition date) and May 6, 2022, or perhaps slightly later. It would be pure speculation to infer that any texts were sent significantly after May 6. As noted earlier, the latest known collection email was sent in July 2022. Because it is probable that Zip's collection efforts by text message and email were going on at the same time, the cessation of emails in July 2022 provides more support for the finding that the texts also stopped coming in the spring or summer of that year.

Almy said she received "daily" automated phone calls from Zip during an unspecified period of time. She estimated that she received 100 daily calls–in essence, one each day for 100 days. If that estimate is correct, and if the calls began shortly after the petition date, then the latest call occurred around July 2022. That conclusion is consistent with the known dates of collection emails and texts, and I find that the phone calls likewise continued until the summer of 2022. Although she did not describe the contents of these calls, it is apparent from her testimony that they were calls urging her to pay.

### C.    *New email address*

Almy said she gave up the email address she had used for about 20 years and set up a new one because "they were swamping her email with so much spam s**t."

### D.    Credit-bureau reports

Almy made several references to "credit bureau" reports, but she did not offer any reports as exhibits. She said her credit score is "in the trash right now," which she attributed to Zip.

### E.    Emotional distress

The evidence included a June 3, 2024, letter Andrea Lucio Rosales, a licensed professional counselor, about providing Almy with clinical mental health services since July 1, 2022. Rosales wrote the letter in response to Almy's request to describe "our current work and the impact this case had had on her." Almy came to Rosales to work on "various symptoms" and "anxiety management." Almy told Rosales that the bankruptcy case, specifically "the slow nature of the case," had "manifested undue stress on" Almy, "leading to an increase in worry and compounding her already existing anxiety . . .." According to Rosales, "[a]nxiety has made it more frequently difficult for my client to manage her day to day life which this case has added to."[21]

Almy testified that the emails meant to her that "the bankruptcy wasn't working." She said she was "worried that I was going to have to pay this off even though it was supposed to have been included in the bankruptcy." She said that her "anxiety is through the roof," and "this is the

---

[21] ECF No. 34-7, Ex. G.

only negative thing I've got hanging over my head right now." She no longer answers the phone if she doesn't recognize the caller's number.

### F. WebBank

The October 2023 privacy-policy email contains fine print saying, "Loans through the Zip app are originated by WebBank, except for Zip-originated loans in CO, NV, MA, and MD."[22] This statement might imply that, when Zip communicated with Almy, it was acting as the agent of WebBank. But it's also possible that WebBank had sold the loan or otherwise ceased to have any involvement at some point before the communications.

On this evidence, I cannot find that Zip was acting as WebBank's agent at the time of the violative communications.

## IV. Motion

In the notice-of-motion portion of the motion, Almy moves "for an order holding Zip Co US Inc. and Webbank ("Creditors") in contempt of the automatic stay and discharge injunctions." And she prays for awards of compensatory damages of not less than $30,000, "mild deterrent sanctions not to exceed $5,000," attorney fees and costs, and "[p]unitive sanctions in the estimated amount of 3x the damages award." As authority for that relief, she cites 11 U.S.C. §§ 105, 362, and 524.

---

[22] ECF No. 34-5, Ex. E at 2.

## V.    Analysis

### A.    *Jurisdiction and authority*

The district court has jurisdiction over this motion, a civil proceeding arising in this case.[23] The district court has referred to this court all bankruptcy cases and proceedings in this district.[24] The motion affects the adjustment of the debtor-creditor relationship and is thus a core proceeding,[25] which this court may hear and determine.[26]

### B.    *Legal principles*

#### 1.    Automatic stay

The filing of a voluntary bankruptcy petition initiates the automatic stay of certain acts, including the "any act to . . . recover a claim against the debtor that arose before the commencement of the" bankruptcy case.[27] In the chapter 7 case of an individual debtor, that stay terminates when the discharge is granted or denied.[28]

#### 2.    Discharge injunction

With immaterial exceptions, a chapter 7 debtor is entitled to a discharge[29] of all debts that arose before the order for relief.[30] In a voluntary

---

[23] 28 U.S.C. § 1334(b).
[24] LR 2100-1.
[25] 28 U.S.C. § 157(b)(2)(O).
[26] 28 U.S.C. § 157(b)(1).
[27] 11 U.S.C. § 362(a)(6).
[28] 11 U.S.C. § 362(c)(2)(C).
[29] 11 U.S.C. § 727(a).
[30] 11 U.S.C. § 727(b).

case, the petition constitutes the order for relief.[31] The discharge "operates as an injunction against . . . an act . . . to collect [or] recover . . . [a discharged] debt as a personal liability of the debtor . . .."[32]

### 3.    Enforcement of stay and discharge injunction by contempt proceedings

Under section 105(a), a bankruptcy court may issue any order necessary or appropriate to carry out provisions of title 11 of the U.S. Code. Orders authorized by section 105(a) include orders of civil contempt.[33] A party may be held in contempt if it violates a specific and definite court order and the violation is proved by clear and convincing evidence.[34] Both the automatic stay and the discharge injunction are specific and definite court orders the violation of which is contumacious.[35]

### 4.    Contempt sanctions available from bankruptcy court

The primary purpose of contempt sanctions is to vindicate the court's authority.[36] The contempt power is "uniquely liable to abuse," in part because "[u]nlike most areas of law, where a legislature defines both the sanctionable conduct and the penalty to be imposed, civil contempt proceedings leave the

---

[31] 11 U.S.C. § 301(b).
[32] 11 U.S.C. § 524(a)(2).
[33] Walls v. Wells Fargo Bank, N.A., 276 F.3d 502, 510 (9th Cir. 2002).
[34] Renwick v. Bennett (*In re* Bennett), 298 F.3d 1059, 1069 (9th Cir. 2002).
[35] Knupfer v. Lindblade (*In re* Dyer), 322 F.3 1178, 1191 (9th Cir. 2003) (automatic stay); *Walls*, 276 F.3d at 507 (discharge injunction).
[36] *Dyer*, 322 F.3d at 1194.

offended judge solely responsible for identifying, prosecuting, adjudicating, and sanctioning the contumacious conduct."[37]

In the Ninth Circuit's 2003 decision in *Knupfer v. Lindblade (In re Dyer)*,[38] the court held that a bankruptcy court can impose only sanctions that are civil–those that are "either . . . compensatory or designed to coerce compliance."[39] Sanctions are compensatory if they "compensate the complainant for losses" stemming from the defendant's noncompliance with an injunction.[40] Compensatory sanctions include compensatory damages, attorney fees, and the contemnor's compliance with the discharge injunction.[41]

Sanctions are coercive if they are "designed to compel future compliance with a court order" and are "avoidable through obedience."[42] The "paradigmatic" example of a coercive sanction is "confining a contemnor indefinitely until he complies" with the court's order.[43] But coercion can also result from a monetary penalty–such as a daily fine that accrues as long as

---

[37] *Bagwell*, 512 U.S. at 831.
[38] *Dyer*, 322 F.3d at 1192.
[39] *Dyer*, 322 F.3d at 1192.
[40] Taggart v. Lorenzen, 587 U.S. 554, 560 (2019), quoting United States v. Mine Workers, 330 U.S. 258, 303–04 1947); *Dyer*, 322 F.3d at 1192.
[41] *Walls*, 276 F.3d at 507.
[42] Int'l Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 827 (1994).
[43] *Bagwell*, 512 U.S. at 828.

the contemnor remains in contempt but that stops accruing when the contemnor complies with the court order.[44]

A bankruptcy court cannot impose sanctions that are criminal. A contempt sanction is criminal if it is "serious," entitling the contemnor to the procedural protections of the Sixth Amendment to the U.S. Constitution, including trial by jury.[45] A sanction is "serious" if it involves a large fine or significant jail time[46] or "was neither intended to coerce compliance nor intended to compensate" the victim for actual damages.[47] *Dyer* "le[ft] for another day the development of a precise definition of the term 'serious' punitive (criminal sanctions)"[48]–while describing a 2001 decision[49] as "implying that any fine above $5,000, 'at least in 1998 dollars,' would be serious, but declining to reach the question."[50] It also left open the possibility that a bankruptcy court could impose what it called "'relatively mild' noncompensatory fines" under 11 U.S.C. § 105(a).[51]

*Dyer* did "not preclude the possibility that a bankruptcy court could initiate criminal contempt proceedings by referring alleged contempt to the district court" or that the bankruptcy court could "refer those proceedings

---

[44] *Bagwell*, 512 U.S. at 829.
[45] *Bagwell*, 512 U.S. at 826–27.
[46] *Bagwell*, 512 U.S. at 837.
[47] *Dyer*, 322 F.3d at 1192.
[48] *Dyer*, 322 F.3d at 1193.
[49] F.J. Hanshaw Enters. Inc. v. Emerald River Dev., Inc.,244 F.3d 1128, 1140 n.10 (9th Cir. 2001).
[50] *Dyer*, 322 F.3d at 1193.
[51] *Dyer*, 322 F.3d at 1193.

back to the bankruptcy court if the parties so consented."[52] The "referral" that *Dyer* describes would be accomplished by the district court's withdrawal from the bankruptcy court of the referral of the contempt motion to the bankruptcy court.[53] That criminal contempt sanctions might be available after withdrawal suggests that the unavailability of those sanctions before withdrawal derives from the constitutional limitations on a bankruptcy judge's authority, rather than from the text of section 105(a).

### 5. Availability of emotional-distress damages as contempt sanction for stay and discharge violations

In the Ninth Circuit's 2004 decision in *Dawson v. Washington Mutual Bank, F.A.*,[54] the court held that "under § 362(h) [now (k)], emotional distress damages are cognizable . . .."[55] As support for that holding, the court looked to "a contextual clue"–that "Congress chose the term 'individual' to describe those who are eligible to claim actual damages under § 362(h)."[56] By that limitation, Congress "signaled its special interest in redressing harms that are unique to human beings. One such harm is emotional distress, which can be suffered by individuals but not by organizations."[57] The court added that a purpose of the automatic stay was to stop harassment of debtors by creditors and to give "due regard to the dignity of the consumer as an individual who is

---

[52] *Dyer*, 322 F.3d at 1194 n.17.
[53] *See* 28 U.S.C. § 157(d).
[54] 390 F.3d 1139 (9th Cir. 2004).
[55] *Dawson*, 390 F.3d at 1148.
[56] *Dawson*, 390 F.3d at 1146.
[57] *Dawson*, 390 F.3d at 1146.

Page 14 – MEMORANDUM DECISION ON MOTION FOR CONTEMPT etc.

in need of help."[58] Congress "was concerned not only with financial loss, but also–at least in part–with the emotional and psychological toll that a violation of a stay can exact from an individual."[59] The court deduced the subject of Congress's concern in part from extensively quoted legislative history.[60] The court concluded that it "makes sense to conclude that harm done to non-financial interests by a violation are cognizable as 'actual damages.'"[61]

Because section 362(k) permits an individual injured by a stay violation to recover money damages, it can be enforced only by an adversary proceeding.[62] A victim of a stay violation may alternatively move to hold the violator in contempt, but in that case the bankruptcy court can impose only remedies generally available for contempt.

Neither the Supreme Court nor the Ninth Circuit have decided whether a bankruptcy court can award emotional-distress damages as a civil-contempt remedy. But the reasoning of *Dawson* supporting its conclusion that emotional-distress damages are actual damages under section 362(k) also supports treating emotional-distress damages as part of the compensation that a bankruptcy court can award for civil contempt. Like the automatic stay, the discharge injunction is intended to protect more than

---

[58] *Dawson*, 390 F.3d at 1148.
[59] *Dawson*, 390 F.3d at 1148.
[60] *Dawson*, 390 F.3d at 1147–48.
[61] *Dawson*, 390 F.3d at 1148.
[62] Fed. R. Bankr. P. 7001(1).

financial interests. Section 524(a)(2) enjoins not just "collection" of a discharged debt but an "*act . . . to* collect" a discharged debt. It is thus designed to prevent not just the financial harm of a *completed* collection of a discharged debt, but also the nonfinancial harm of an *attempted* collection of a discharged debt.[63] That conclusion is consistent with the legislative history of section 524(a), describing enjoined activity to include "telephone calls, letters, and personal contacts" and the purpose of the discharge to be "insur[ing] that once a debt is discharged, the debtor will not be pressured in any way to repay it."[64] Because the nonfinancial interests protected by the discharge injunction are similar to those protected by the automatic stay, the reasoning of *Dawson* applies equally to the discharge injunction, making emotional-distress damages recoverable as part of the compensatory damages for civil contempt.

In the Eleventh Circuit's 2015 decision in *Green Point Credit, LLC v. McLean (In re McLean)*,[65] the court held that, because the actual damages recoverable under section 362(k) can include damages for emotional distress, "[i]t follows, then, that bankruptcy courts generally have authority to award compensatory sanctions for emotional distress caused by a violation of the

---

[63] Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin, 599 U.S. 382, 390 (2023) (discharge enjoins creditors "from trying to collect debts that have been discharged.").

[64] H.R. Rep. No. 595, 95th Cong., 1st Sess. 365–66 (1977), S. Rep. No. 989, 95th Cong. 2d Sess. 80 (1978), U.S. Code Cong. & Admin. News 1978 at 5963, 6321, 5787, 5866.

[65] 794 F.3d 1313 (11th Cir. 2015).

discharge injunction."[66] The court held that "there is no material difference in the equitable interests a bankruptcy court must consider in imposing emotional distress damages for the violation of one provision as opposed to the other," referring to the automatic stay and the discharge injunction.[67]

The Ninth Circuit prefers to avoid creating a circuit split "if at all possible"[68] and "unless there is a compelling reason to do so."[69] Here, because *Dawson*'s reasoning supports including emotional-distress damages in the compensatory damages available for contempt, I predict that the Ninth Circuit would follow *McLean* and hold that emotional-distress damages are recoverable as compensatory damages for civil contempt for violating the stay or discharge injunction.[70]

## C.    *Elements of emotional-distress damages*

In *Dawson*, the Ninth Circuit held that to be entitled to emotional-distress damages under section 362(k) (then [h]), "an individual must (1) suffer significant harm, (2) clearly establish the significant harm, and (3) demonstrate a causal connection between that significant harm and the violation of the automatic stay (as distinct, for instance, from the anxiety

---

[66] *McLean*, 794 F.3d at 1325.

[67] *McLean*, 794 F.3d at 1325 n.5.

[68] United States v. Anderson, 46 F.4th 1000, 1008 (9th Cir. 20022).

[69] Padilla-Ramirez v. Bible, 882 F.3d 826, 836 (9th Cir. 2017), quoting Kelton Arms Condo. Owners Ass'n, Inc. v. Homestead Ins. Co., 346 F.3d 1190, 1192 (9th Cir. 2003).

[70] *See also* Valdellon v. PHH Mortgage Corporation (*In re* Valdellon), 665 B.R. 420 (9th Cir. B.A.P. 2024) (bankruptcy courts may award emotional-distress damages for violations of discharge injunction).

and pressures inherent in the bankruptcy process)."[71] Fleeting or trivial anxiety or distress does not suffice to support an award; the emotional harm must be "significant." A victim may establish emotional-distress damages clearly by producing corroborating medical evidence or the testimony of close acquaintances to the victim's manifestations of mental anguish that clearly establish the occurrence of significant emotional harm.[72] Significant emotional distress may also be readily apparent even without corroboration, such as if the violator has engaged in egregious conduct or "the circumstances make it obvious that a reasonable person would suffer significant emotional harm.".[73]

In *McLean*, the Eleventh Circuit adopted essentially the same three elements for an emotional-distress damages for civil contempt.[74] Just as I predict the Ninth Circuit would follow the Eleventh Circuit and hold that emotional-distress damages are recoverable in civil contempt, I predict that the Ninth Circuit would also adopt the same three elements the Eleventh adopted in *McLean*.

### D.    *Application of legal principles*

#### 1.    **Violative communications**

By documentary exhibits, Almy proved 10 communications by Zip in 2022 that were attempts, before and after the June 24 discharge, to collect its

---

[71] *Dawson*, 390 F.3d at 1149.
[72] *Dawson*, 390 F.3d at 1149.
[73] *Dawson*, 390 F.3d at 1150.
[74] *McLean*, 794 F.3d at 1325.

prepetition debt from her and thus violated either the stay or the discharge injunction. Those communications were the text on April 24, the email on May 3, the email and text on May 6, the emails on May 8, 9, and 23, the two undated texts that I earlier inferred were sent before the June 24 discharge, and the email on July 6.

Although I find it likely that at least some emails other than those in the record contained demands for payment, there is no direct evidence that any such emails were sent after July 6. Because a contempt movant must prove contempt by clear and convincing evidence, I am unable to find that any emails that may have been sent after July 6 were attempts to collect a debt in violation of the June 24 discharge.

The one email in the evidentiary record sent after July 6 was sent in October 2023–but it is just an update of Zip's privacy policy. Almy's testimony implied that she did not distinguish between that email and the earlier ones. Although it's understandable that she would see all unwanted communications from Zip as equally irritating, the privacy-update email does not demand payment of any debt or even refer to the existence of a debt.

Almy said the communications for which she offered documentary evidence were just a sample of all the emails and text. But she offered no explanation why, if she could produce 10 emails or texts, she could not produce other written communications by Zip. I decline to find that she received additional emails or texts not offered in evidence, or any such

additional emails or texts did not materially add to the injury she had already suffered from the emails and texts that are in evidence.

### 2.      Compensatory damages for economic loss

The motion asks for damages for, among other things, "economic loss," as well as emotional harm. But the record includes no evidence of economic, or pecuniary, loss, such as the loss of money or property or of the opportunity or ability to obtain money or property.

### 3.      Compensatory damages for emotional distress

Almy has demonstrated that Zip's violations of the stay and discharge injunction caused her to suffer emotional distress. She is therefore entitled to compensation.

From Almy's several emails to her lawyer's office included in the evidence (specifically hers of May 23, 2022), I infer that she knew that the communications were improper and that she had, in fact, been discharged from Zip's debt. So the anxiety she suffered did not materially result from any concern that the bankruptcy case had not resulted in discharge of Zip's debt.

Rosales's June 3, 2024, letter and Almy's testimony show that Almy's ordinary anxiety and distress were aggravated by the bankruptcy case, but they it shed no light on the effect on Almy caused specifically by Zip's communications rather than by the bankruptcy case as a whole. Almy conceded she sought therapy "not just for this reason," referring to the

communications from Zip. She said she is a "recently divorced, single mom with four kids . . . overwhelmed with bills because of her divorce," and she "wanted to stop all the stresses of having to deal with the overwhelming amount of debt that I had incurred from the divorce." The "slow nature of the case" to which Rosales referred likely refers to the period of nearly two years that had passed between July 6, 2022, the last documented Zip collection effort, and the date of Rosales's letter, June 3, 3024, when the motion had not yet been filed. That delay cannot be attributed to Zip.

And some of the anxiety caused by Zip resulted from its lawful communications about its privacy policy, which also distressed Almy greatly but cannot be considered here because they were not wrongful.

Still, there are aspects of Zip's unlawful communications that support a compensatory award. Daily phone calls for 100 days, in addition to the regular texts and emails, forcing Almy to change her email address, is an aggressive campaign of pestering Almy for payment. Under those circumstances, her worries about Zip were probably on her mind much of the time. As required by *Dawson*, the evidence clearly establishes that Zip's communications caused Almy significant emotional harm, her anxiety or distress was neither fleeting nor trivial, and her damages are presumed from the egregiousness of Zip's conduct.

The record evidence is insufficient for me to find that Zip made any improper credit reports or that Almy was damaged by them.

Given all these circumstances, I decline Almy's invitation to award damages of $30,000, or $3,000 per violative communication, but I will award compensatory damages of $500 for each of the 10 violative communications proved by documentary evidence, for a total of $5,000.

### 4.    Coercive sanctions

As discussed above, coercive sanctions are used to pressure a contemnor to stop disobeying a court order. They are available only when the contemnor's disobedience is ongoing.

Zip's most recent discharge violation occurred in 2022, so there is no ongoing disobedience and no need for coercive sanctions.

### 5.    Mild punitive sanctions

The purpose of punitive sanctions is to punish and deter by inflicting suffering on a wrongdoer beyond what is necessary to compensate the victim. Punishment for contempt of a court order is warranted when the contemnor, knowing of the order, violates it and either calculates that the benefits of contempt outweigh the cost of compensating the victim or is so driven by passion or hatred that the contemnor is willing to pay compensation to satisfy its desire to inflict suffering on the victim. Punitive sanctions are also warranted where necessary to deter future contempt in the same or similar cases.

That Zip's communications continued for over three months after it received notice of the bankruptcy–and two months after it received Almy's

lawyer's warning letter–shows that its procedures to comply with bankruptcy notices either don't exist or are insufficient or ignored. Zip appears to be a sophisticated user of electronic communications, suggesting that it has the resources to establish appropriate systems to address bankruptcy notices but has just chosen not to do so.

In some circumstances, the amount of compensatory damages awarded for law-breaking are sufficient to deter future violations. But here, that is not the case. I find that, in addition to the compensatory damages of $500 per communication, the circumstances warrant an award of mild punitive sanctions of $500 for each of the 10 violative communications proved by documentary evidence, or a total of $5,000.

## VI.    Conclusion

I will order Zip to pay Almy $10,000, the sum of $5,000 in compensatory sanctions and $5,000 in mild punitive sanctions. She may file a motion for attorney fees. I will deny all other requests for relief.

I will prepare the order, so no order need be lodged.

# # #